IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

MARY CIOCCA                             :
                                        :    CIVIL ACTION
            v.                          :
                                        :    NO. 17-5222
HEIDRICK & STRUGGLES, INC.              :

**MEMORANDUM**

**SURRICK, J.**                                                 **APRIL 1, 2020**

Presently before the Court in this employment discrimination matter is Defendant's Motion for Summary Judgment. (ECF No. 38.) For the following reasons, Defendant's Motion will be granted in part and denied in part.

**I.    FACTUAL BACKGROUND**

Decision Strategies International ("DSI"), a consulting firm, hired Plaintiff Mary Ciocca as its office administrator in June of 2011. (June 28, 2018 Deposition of Plaintiff ("Pl. Dep.") at 24, ECF No. 40-1.) Plaintiff technically reported to Howard Cohen. However, she was assigned to Steven Krupp, whose travel, calendar, and expenses she managed. (*Id*. at 27-28; Sept. 6, 2018 Deposition of Steven Krupp ("Krupp Dep.") at 20, ECF No. 40-3.) As office administrator, Plaintiff also managed office supplies, office events, and logistics. (Pl. Dep. at 25-28; Krupp Dep. at 21.) On occasion, she also assisted other members of the firm, such as Amy Miller, who was a principal at the firm. (Sept. 5, 2018 Deposition of Amy Miller ("Miller Dep.") at 60, 78-79, ECF No. 40-2; Krupp Dep. at 21-22.) While at DSI, Plaintiff was never formally disciplined, but with respect to logistics and scheduling, Krupp recalls that "she would make errors, she would make mistakes, she would miss things, she wouldn't follow up on things." (Krupp Dep. at 22, 28.) Krupp addressed his concerns with Plaintiff several times, especially when there was a

scheduling problem that left him without appropriate travel arrangements. (*Id*. at 23-25.) On multiple occasions, Krupp and Cohen discussed whether they should keep Plaintiff on as an employee, given that her "performance problems" "never really got solved." (*Id*. at 26-27.) Miller also recalls that Plaintiff "had some challenges with being detail oriented … there were certain things she missed." (Miller Dep. at 79.) Despite these concerns, Plaintiff consistently received positive feedback from Krupp, Miller, and others at DSI for setting up successful work events. (*See* Pl. Ex. E, ECF No. 40-5.) Krupp also acknowledges that Plaintiff "performed well in the … office administration role, meaning she did a much better job of keeping things, shelves stocked, supplies in the office including food and stuff like that." (Krupp Dep. at 22.)

In March of 2016, Defendant Heidrick & Struggles, Inc. ("H&S"), an international consulting firm, acquired DSI. (Krupp Dep. at 28, 34.) Because of various redundancies in personnel, Cohen and some others did not stay with H&S long-term after the acquisition. (*Id*. at 29-30.) However, Krupp and Miller stayed on with H&S. (Miller Dep. at 62-63; Pl. Dep. at 43.) So, too, did Sarah Schwab, who was formally a partner at DSI. Schwab, however, left H&S around July 1, 2016. (Pl. Dep. at 42-43; Miller Dep. at 62-65.) In connection with the acquisition, and before Schwab's exit, she and Miller created a leadership development coordinator ("LDC") role for Plaintiff at H&S. (Miller Dep. at 79; Pl. Dep. at 34-37, 47.) In that new role with Defendant, Plaintiff was part of the learning and development team ("L&D") and reported to Miller. (Miller Dep. at 79; Pl. Dep. at 49.) Plaintiff's responsibilities included managing documentation related to subcontractors, such as contracts, statements of work, client information, billing information, and schedules. Plaintiff also did some client-oriented work, such as preparing PowerPoint decks and coordinating travel and logistics. (Pl. Dep. at 47-48.)

When Plaintiff was first offered the LDC position, Miller believed that she was qualified for the role. (Miller Dep. at 84-85.)

On March 9, 2016, Plaintiff informed Miller that she was undergoing intrauterine insemination fertility treatments ("IUI"). She also advised Miller, Schwab, and Krupp of her upcoming medical appointments related to her fertility treatment. (Pl. Dep. at 224-25.) In response, Miller told Plaintiff to keep her apprised of her schedule. (*Id*. at 231.) To do so, Plaintiff sent emails to Miller, Schwab, and Krupp advising them of her appointments and her anticipated arrival times at the office. (*Id*. at 226.) On March 25, 2016, Plaintiff told Miller that her IUI treatment had failed and that she would be having an *in vitro* fertilization ("IVF") consultation on April 5, 2016. (*Id*. at 228.) She also explained to Miller that IVF was more complicated than IUI, such that she would have more medical appointments. Miller reminded Plaintiff to keep her, Krupp, and Schwab apprised of her schedule. (*Id*. at 234-35.)

According to Krupp, Plaintiff's performance issues continued after the acquisition. He testified that Plaintiff "had a consistent pattern … of making errors, making mistakes, missing things, [and] not always following through accurately." (Krupp Dep. at 38-39.) Miller, too, had concerns about Plaintiff's performance shortly after Plaintiff started her new position with H&S. (Miller Dep. at 113.) By early April 2016, Schwab, Miller, and others in human resources at H&S began discussing putting Plaintiff on a performance improvement plan ("PIP"). (Pl. Ex. H, ECF No. 40-8; Oct. 15, 2018 Deposition of Nathalie Moalic ("Moalic Dep.") at 41, 58.) In an April 12, 2016 email, one of the human resources business partners involved with the PIP discussions, Nathalie Moalic, wrote that she had "explained to [Schwab] the Performance Improvement Plan process that we use in the US: whether 90 days improvement plan if we believe in the possibility to improve or 30 to 45 days plan if our goal is termination." (Pl. Ex.

H.)  In late May or early June of 2016, Miller and Schwab decided to put Plaintiff on a PIP. (Miller Dep. at 113-14.)  On June 2, 2016, Miller and Schwab told Plaintiff that she was being put on a 45-day PIP for "lack of attention to detail and extensive errors, inconsistent accessibility and follow through."  (Pl. Dep. at 92-96.)  When asked to elaborate on "inconsistent accessibility," Miller testified that Plaintiff was "sometimes … difficult to get ahold of."  (Miller Dep. at 157.)

In connection with the PIP, Plaintiff had weekly check-in meetings.  (Pl. Dep. at 142.)  At one such meeting on July 12, 2016, Plaintiff informed Miller and Krupp that she was pregnant.  (*Id*. at 142-43.)  According to Plaintiff, she received a "[v]ery lukewarm response.  [Miller] gave [her] a very halfhearted hug.  [Krupp] said, oh, congratulations.  It didn't seem particularly warm."  (*Id*. at 143.)  Later during the July 12 meeting, Krupp raised an issue regarding a botched hotel booking in June.  Miller also brought up a problem relating to certain expenses.  Plaintiff recalls that these issues were raised and addressed at previous check-in meetings.  (*Id*. at 145.)  Six days later, on July 18, 2016, Miller and a human resources employee met with Plaintiff and advised her that they were amending the PIP, such that it had become a new 30-day plan for which they would check in again in 30 days, on August 17, 2018.  (*Id*. at 160-62.)  According to this second PIP, Plaintiff was exhibiting a "continued lack of attention to detail and extensive errors" and "inconsistent accessibility and follow through."  (*Id*. at 163-64.)  Miller testified that she, Krupp, and a human resources team member amended the original PIP because they "wanted to give [Plaintiff] additional time to try to correct things," and that the goal at that time was not termination because they "still all believed that there was a possibility of improvement on her part."  (Miller Dep. at 58-59.)

4

On August 18, 2016, Krupp and Miller informed Plaintiff that she was being terminated, effective immediately, for failing to improve her performance deficiencies. (Pl. Dep. at 187-89; Miller Dep. at 251-52.) According to Krupp, while Plaintiff was on her PIP, "the issues unfortunately continued, [and] maybe got worse." (Krupp Dep. at 100.) Krupp also explained that

> at times she was harder to reach. I know she was leaving the office early. She was asked to stay at the office when she was there, but she was deciding I think on her own to just leave, and then at times I just couldn't get a hold of her. So if no one else – if a few people were in the office I think she took it upon herself to leave even though we had asked her to let us know or just get a general go ahead or approval on that. Again, you know, there were continued – the same issues continued, did not get better, put it that way. We didn't see the improvement that we had hoped – we hoped for when we provided the extension.

(*Id*. at 100-01.) Miller testified that Plaintiff was ultimately fired because she made errors in scheduling meetings and preparing statements of work, she was sometimes unavailable when working from home, and she left the office early without telling her superiors. (Miller Dep. at 53-55.) According to Miller, Plaintiff was supposed to make the L&D team members' jobs easier, but her various mistakes actually made their jobs more difficult. (*Id*. at 55.) Miller also felt that she "couldn't trust [Plaintiff's] work product." (*Id*. at 55-56.)

Plaintiff alleges that after she advised Miller that she intended to become pregnant, Miller's "demeanor towards [her] changed." (Pl. Dep. at 190.) Plaintiff does not elaborate on this. However, she contends that Miller "micromanaged" her, including by holding "weekly check-in meetings, which as far as [Plaintiff] [knew], she did not have with anyone else on the L&D team. Other members of the L&D team were free to work from home, come in late, leave early and did not have to notify anybody. [Plaintiff] was the only one." (*Id*. at 198.) Plaintiff, too, was permitted to work from home, but she recalls a conversation in spring 2016 in which

5

Miller told Plaintiff that she believed Plaintiff's "two year old child would interfere with her work if she worked from home, and that [P]laintiff could not be an effective employee or work effectively from home as a mother of a small child." (*Id*. at 191-92, 194.)[1]  According to Plaintiff, this conversation came about in connection with informal exchanges regarding office culture and the transition from DSI to H&S.  (*Id*. at 193.)  Plaintiff admits that this comment by Miller "was the only comment she made about working while having a small child at home." (*Id*. at 195.)  In addition, the "only thing that [Miller] said directly [regarding Plaintiff's pregnancy] was congratulations…. Otherwise she didn't ask any other questions, didn't ask how [Plaintiff] was doing…." (*Id*. at 195.)  Miller did not make any comments to Plaintiff about "being a woman" in her job.  (*Id*.)  Plaintiff admits that neither Miller nor anyone else from H&S made any other comments evincing discrimination or harassment.  (*Id*.)

Defendant admits that it is "not in possession of any documents dated prior to April 1, 2016 that identify any performance-related issues regarding Plaintiff's employment with Defendant." (Def.'s Oct. 15, 2018 Resp. to Pl.'s Requests for Admissions ¶ 22, ECF No. 40-11.) In addition, prior to June 2, 2016, Plaintiff had never before been put on a PIP.  (Pl. Dep. at 94.) Plaintiff admits that while at H&S, she did "make some scheduling related mistakes." (*Id*. at 96, 98.)  She explained, however, that when she "first started working for [Miller], [she] was not given any formal training, and so [she] was learning as [she] went.  So, any errors that [she] made were made because [she] had no formal training and [she] did learn and correct." (*Id*. at 97.)  Plaintiff also admits that during the PIP period, she arrived late to work or left the office

---

[1] Plaintiff gave birth to a daughter in 2013, while employed at DSI.  The pregnancy at issue in this case pertains to Plaintiff's second daughter.  (Pl. Dep. at 9, 30.)

early on several occasions without first obtaining approval from Krupp or Miller. (*See generally id*. at 169-86.)

## II. PROCEDURAL HISTORY

On November 20, 2017, Plaintiff filed a Complaint, alleging violations of: Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended by the Pregnancy Discrimination Act ("PDA"), 42 U.S.C. §§ 2000e-2000e-17 (Count I); the Family and Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601-2654 (Count II); and the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. Stat. §§ 951-63 (Count III). (ECF No. 1.) On January 25, 2018, the parties stipulated to the dismissal without prejudice of the FMLA claim (Count II). (ECF No. 9.) On April 11, 2018, Defendant filed a Motion to Clarify and Confirm Claims Alleged in Complaint. (ECF No. 17.) On May 1, 2018, Plaintiff filed a memorandum in opposition to the motion. (ECF No. 18.) On May 9, 2018, Defendant filed a reply and Plaintiff filed a sur-reply. (ECF Nos. 20 & 21.) On May 21, 2018, a Memorandum and Order were filed denying Defendant's Motion and providing that Plaintiff could pursue claims for pregnancy and sex discrimination, as well as a hostile work environment claim. (*See* Memorandum and Order, ECF Nos. 22 & 23.)

On November 15, 2018, Defendant filed the instant Motion for Summary Judgment. (ECF Nos. 38 & 39.) Plaintiff filed a Response in Opposition on December 14, 2018. (ECF Nos. 40 & 41.) On January 9, 2019, Defendant filed a Reply. (ECF Nos. 42 & 43.)

## III. LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When making this determination, we must weigh all facts in the light most favorable to the non-moving party and draw all reasonable inferences in favor of the non-moving

7

party. *Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 288 (3d Cir. 2018). "For its part, '[t]he non-moving party must oppose the motion and, in doing so, may not rest upon the mere allegations or denials of his pleadings' but, instead, 'must set forth specific facts showing that there is a genuine issue for trial. Bare assertions, conclusory allegations, or suspicions will not suffice.'" *Id*. at 288-89 (quoting *D.E. v. Central Dauphin Sch. Dist.*, 765 F.3d 260, 268-69 (3d Cir. 2014)). "A factual dispute is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Id*. at 289 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "Conversely, 'where a non-moving party fails sufficiently to establish the existence of an essential element of its case on which it bears the burden of proof at trial, there is not a genuine dispute with respect to a material fact and thus the moving party is entitled to judgment as a matter of law.'" *Goldenstein v. Repossessors Inc.*, 815 F.3d 142, 146 (3d Cir. 2016) (quoting *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 265 (3d Cir. 2014)).

## IV. DISCUSSION [2]

### A. Plaintiff Has Failed to Establish a Hostile Work Environment

To succeed on a sex-based hostile work environment claim, a plaintiff must show: "1) [he/she] suffered intentional discrimination because of his/her sex, 2) the discrimination was severe or pervasive, 3) the discrimination detrimentally affected the plaintiff, 4) the discrimination would detrimentally affect a reasonable person in like circumstances, and 5) the existence of *respondeat superior* liability." *Mandel v. M&Q Packaging Corp.*, 706 F.3d 157,

---

[2] The analysis of Plaintiff's claims under Title VII and the PHRA "is identical, as Pennsylvania courts have construed the protections of the two acts interchangeably." *Huston v. Procter & Gamble Paper Prod. Corp*., 568 F.3d 100, 104 n. 2 (3d Cir. 2009) (internal quotation marks and citation omitted).

8

167 (3d Cir. 2013). These elements—and the discussion that ensues—apply equally to cases, such as this one, in which the alleged discrimination is based on or related to pregnancy. *See Mayer v. Prof'l Ambulance, LLC*, 211 F. Supp. 3d 408, 419 (D.R.I. 2016) (finding that comments regarding plaintiff's breast pumping could contribute to a hostile work environment because lactation is a medical condition related to pregnancy); *Mercer v. Gov't of the Virgin Islands Dep't of Educ.*, No. 14-50, 2016 WL 5844467, at *12 (D.V.I. Sept. 30, 2016) (holding that "conduct that is not explicitly pregnancy-based may be illegally pregnancy-based and properly considered in a hostile work environment analysis when it can be shown that but for the employee's pregnancy or pregnancy-related medical condition, she would not have been the object of harassment").

Plaintiff cannot succeed on her hostile work environment claim because she has not established that the alleged discrimination was severe or pervasive. To prove this element, the plaintiff "must show that her workplace was 'permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Rorrer v. Cleveland Steel Container*, 712 F. Supp. 2d 422, 428 (E.D. Pa. 2010) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). This depends on a totality of the circumstances, "including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it [unreasonably] interferes with an employee's work performance.'" *Id.* (quoting *Harris*, 510 U.S. at 23). "'[O]ffhanded comments, and isolated incidents (unless extremely serious)' are not sufficient to sustain a hostile work environment claim." *Caver v. City of Trenton*, 420 F.3d 243, 262 (3d Cir. 2005) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)).

9

Plaintiff admits that the only comment indicative of discrimination was Miller's single remark about the difficulty of working at home with small children. Even assuming Miller's comment was discriminatory, that statement, alone, is not sufficiently severe to alter the conditions of Plaintiff's employment or otherwise create an abusive working environment. Plaintiff proffers as additional evidence of a hostile working environment the fact that she was the only L&D team member placed on a PIP and that she was subject to greater scrutiny and micromanagement than her colleagues. These incidents, however, "lack[] in evidence of a [discriminatory] component." *Ponton v. AFSCME*, 395 F. App'x 867, 874 (3d Cir. 2010). Ultimately, the conduct about which Plaintiff complains "is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive." *Harris*, 510 U.S. at 21.

Plaintiff's hostile work environment claim will be dismissed.

### B. Plaintiff's Pregnancy Discrimination Claim May Proceed to Trial, But Her Sex Discrimination Claim Will Be Dismissed

Because there is no direct evidence of discrimination in this case, we analyze Plaintiff's claims under the *McDonnell Douglas* burden-shifting framework. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under this framework, the plaintiff "must first make out a prima facie case of unlawful discrimination." *Geraci v. Moody-Tottrup, Int'l, Inc.*, 82 F.3d 578, 580 (3d Cir. 1996). Once she has done so, the burden of production shifts to the employer to "proffer a legitimate, nondiscriminatory reason" for the adverse employment action. *Id*. If the employer meets that burden, the plaintiff must then prove that the proffered reason was pretextual. *Id*.

> 1. *Plaintiff Has Established a Prima Facie Case of Pregnancy Discrimination*

To establish a *prima facie* case of pregnancy discrimination, a Plaintiff must adduce evidence that: (1) she was pregnant or trying to become pregnant, and the defendant knew it; (2) she was qualified for her position; (3) she suffered an adverse employment action; and (4) there is a sufficient nexus between her pregnancy and the adverse action to support an inference of unlawful discrimination. *Doe v. C.A.R.S. Protection Plus*, 527 F.3d 358, 365 (3d Cir. 2008). "[T]he prima facie requirement for making a [claim of employment discrimination] 'is not onerous' and poses 'a burden easily met.'" *Id*. (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

Defendant asserts that Plaintiff cannot establish the second and fourth elements of her *prima facie* case. With regard to Plaintiff's qualifications for her position, Defendant suggests that Plaintiff's alleged performance deficiencies render her unqualified for the LDC position. This argument "conflates the plaintiff's qualification for her job with the analysis into whether the defendant had legitimate, non-discriminatory reasons for terminating her employment for failing to meet [the] employer's subjective expectations." *Nagle v. Comprehensive Women's Health Servs.*, No. 15-42, 2018 WL 1473833, at *6 (M.D. Pa. Jan. 19, 2018) (citing *Matczak v. Frankford Candy & Chocolate Co.*, 136 F.3d 933, 938-39 (3d Cir. 1997)), *report and recommendation adopted*, 2018 WL 1474545 (M.D. Pa. Mar. 26, 2018). As the Third Circuit has explained, a court should not assess at the *prima facie* stage whether the plaintiff satisfied her employer's subjective expectations:

> Obviously, we cannot evaluate an employer's expectations to see if they have been satisfied as we can objective measures such as, say, educational requirements. In light of this fact, our past rulings prevent satisfaction of an employer's expectations from being a requisite element of a prima facie employment discrimination case.

> We have held that while objective job qualifications should be considered in evaluating the plaintiff's prima facie case, the question of whether an employee possesses a subjective quality . . . is better left to the later stage of the *McDonnell Douglas* analysis. The rationale behind this position is that subjective evaluations are more susceptible of abuse and more likely to mask pretext and, for that reason, are better examined at the pretext stage than at the prima facie stage.

*Matczak*, 136 F.3d at 938-39 (internal citations and quotation marks omitted). In any event, Miller admits that when Plaintiff was first offered the LDC position, she was qualified for that position.

Next, Defendant argues that the evidence does not establish a nexus between Plaintiff's pregnancy and her termination. The requisite nexus may be established where: (1) similarly situated non-pregnant employees were treated better than the plaintiff; (2) the temporal proximity between the pregnancy and the adverse action is unusually suggestive; or (3) review of all the record evidence supports an inference of discrimination. *See C.A.R.S.*, 527 F.3d at 366; *Ahern v. Eresearch Tech., Inc.*, 183 F. Supp. 3d 663, 669 (E.D. Pa. 2016) (citing *Leboon v. Lancaster Jewish Cty. Ctr. Ass'n*, 503 F.3d 217, 232-33 (3d Cir. 2007); *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 280 (3d Cir. 2000)). With respect to temporal proximity, "[t]here is no bright-line rule to determine at what point temporal proximity, in and of itself, can demonstrate an inference of discrimination." *Ahern*, 183 F. Supp. 3d at 669-70; *see also Turevsky v. FixtureOne Corp.*, 904 F. Supp. 2d 454, 464 (E.D. Pa. 2012) (finding temporal proximity between defendants' knowledge of plaintiff's anticipated maternity leave and termination raised inference of discrimination); *Butz v. Lawns Unlimited, Ltd.,* 568 F. Supp. 2d 468, (D. Del. 2008) ("Temporal proximity is sufficient to create an inference of causality to defeat summary judgment.").

Here, the temporal proximity of events leading to Plaintiff's termination gives rise to an inference of discrimination. On July 12, 2016, while on her original 45-day PIP, Plaintiff

informed Miller and Krupp that she had become pregnant. Six days later, on July 18, 2016, Defendant instituted a new 30-day PIP, which, according to Moalic, was more conducive to termination than a longer, 90-day PIP, which was instituted when the company believed improvement was possible. Plaintiff was terminated on August 18, 2016, immediately after the revised PIP ended. The timing of events in this case may be reasonably interpreted to suggest that once Defendant learned of Plaintiff's intent to become pregnant, it began laying the groundwork for Plaintiff's termination, and once Plaintiff did become pregnant, Defendant sped up the process through which it would ultimately terminate Plaintiff. On this basis, Plaintiff can establish a *prima facie* case of pregnancy discrimination. *See also Asmo v. Keane, Inc.*, 471 F.3d 588, 594 (6th Cir. 2006) (finding that employer's decision to terminate employee within two months of learning of employee's pregnancy was sufficiently close temporal proximity to establish nexus between pregnancy and adverse employment action for purposes of a *prima facie* case).

### 2. Plaintiff Has Not Established a Prima Facie Case of Non-Pregnancy-Related Sex Discrimination

To establish a *prima facie* case of discrimination under Title VII in a non-pregnancy context, a plaintiff must show that she is "(1) a member of a protected class; (2) who was qualified for [her] position; and (3) who was discharged 'under conditions that give rise to an inference of unlawful discrimination.'" *Santos v. Iron Mountain Film & Sound*, 593 F. App'x 117, 119 (3d Cir. 2014) (quoting *Geraci*, 82 F.3d at 580-81). "The Third Circuit has adopted a flexible view of this test, rejecting the requirement that a plaintiff compare herself to a similarly situated individual from outside her protected class to raise an inference of unlawful discrimination." *Clair v. Agusta Aerospace Corp.*, 592 F. Supp. 2d 812, 818 (E.D. Pa. 2009)

13

(citing *Sarullo v. United States Postal Serv.*, 352 F.3d 789, 798 n.7 (3d Cir. 2003)). "Importantly, however, a plaintiff 'must establish some causal nexus between his membership in a protected class' and the adverse employment decision complained of." *Id.* (quoting *Sarullo*, 352 F.3d at 798).

The temporal proximity of events leading to Plaintiff's termination gives rise to an inference of pregnancy discrimination. However, that causal nexus does not control with respect to Plaintiff's standard sex discrimination claim. Moreover, there is no other evidence suggesting that Plaintiff's termination—or any other allegedly adverse employment actions, e.g., the PIP or "micromanagement" by Miller—was a result of her sex. Accordingly, we are compelled to conclude that Plaintiff has failed to establish a *prima facie* case of non-pregnancy sex discrimination. Our discussion of the remaining two steps of the *McDonnell Douglas* framework will apply only to Plaintiff's pregnancy discrimination claim.

### 3. *Defendant Advances a Legitimate, Non-Discriminatory Reason For Its Adverse Actions Against Plaintiff*

At the second step of the *McDonnell Douglas* framework, an employer may satisfy its "relatively light" burden of production by introducing evidence which, if taken as true, would permit a conclusion that there was a nondiscriminatory reason for its employment decision. *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994). The employer need not prove that the proffered reason actually motivated the termination decision, because "throughout this burden-shifting paradigm the ultimate burden of proving intentional discrimination always rests with the plaintiff." *Id.* Here, Defendant has met its burden by pointing to Plaintiff's allegedly unsatisfactory performance as the nondiscriminatory reason for her termination. *See Parson v. Vanguard Grp.*, 702 F. App'x 63, 67-68 (3d Cir. 2017) (finding that poor performance may

14

constitute a legitimate, non-discriminatory basis for termination).

> 4. *Plaintiff Has Raised a Genuine Issue of Material Fact as to Whether Defendant's Proffered Reason For Its Employment Decisions Were Pretextual*

At this final stage of the analysis, "the burden of production rebounds to the plaintiff, who must now show by a preponderance of the evidence that the employer's explanation is pretextual (thus meeting the plaintiff's burden of persuasion)." *Fuentes*, 32 F.3d at 763. To meet this burden, a plaintiff must identify evidence from which a reasonable jury could either: "(1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Id*. at 764. This requires plaintiffs to do more than "simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." *Id*. at 765. Plaintiff "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reason[] for its action that a reasonable factfinder *could* rationally find [it] 'unworthy of credence.'" *Id*. (emphasis in original) (quoting *Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 531 (3d Cir. 1992)).

Given Plaintiff's admissions regarding her mistakes and tardiness, there can be no dispute that she exhibited various performance deficiencies, even when she was on the PIP. Our concern, however, is that Plaintiff appears to have exhibited these same performance issues for years, including while she was at DSI, and there is no clear indication in the record as to why her supervisors—who moved with her from DSI to H&S and never before instituted formal employment action against her for work-related issues—suddenly felt it necessary or appropriate

15

to implement a PIP and, ultimately, terminate her in 2016. The only clear and obvious change in circumstances during the relevant timeframe was that Plaintiff announced her intent to become pregnant in early March 2016 and, by July 2016, did become pregnant. Notably, within a month of Plaintiff's initial discussion with Miller regarding her fertility treatment, Defendant began taking steps that were likely to lead to Plaintiff's termination. By April 2016, Defendant commenced internal discussions about putting Plaintiff on a PIP. On June 2, 2016, Defendant implemented a 45-day PIP, which, according to Moalic's April 12, 2016 email, was more geared toward termination than a 90-day PIP, which would have been more amenable and conducive to employee improvement. Around that same time, Plaintiff also noticed that Miller began treating her differently. The chronology of these events casts doubt on the veracity of Defendant's justification for Plaintiff's termination.

Furthermore, Miller's comment about working at home with children, while not sufficient to create a hostile work environment, could give rise to an inference that because of the potential ramifications on Plaintiff's work performance, Miller had significant concerns about Plaintiff having another child. A factfinder could also infer, based on this comment and Miller's participation in Plaintiff's PIP and termination, that Plaintiff's pregnancy was a factor in Miller's decision-making with respect to Plaintiff's employment. "[A]n employer cannot discriminate against a pregnant employee simply because it believes pregnancy *might* prevent the employee from doing her job." *Maldonado v. U.S. Bank*, 186 F.3d 759, 761 (7th Cir. 1999) (emphasis added).

Giving Plaintiff the benefit of all reasonable inferences, a factfinder could disbelieve Defendant's proffered reason for terminating Plaintiff and conclude that Plaintiff's pregnancy or intended pregnancy was a motivating factor for her termination. *See In re Carnegie Ctr. Assocs.*,

16

129 F.3d 290, 294 (3d Cir. 2008) ("There is employment discrimination whenever an employee's pregnancy is a motivating factor for the employer's adverse employment decision."). Accordingly, Plaintiff's pregnancy discrimination claim may go forward.

## V. CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment will be granted in part and denied in part.

An appropriate order follows.

**BY THE COURT:**


**/s/ R. Barclay Surrick**
**R. BARCLAY SURRICK, J.**